# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br>　　vs.<br>ANDRES CHAVEZ-CHAVEZ (1),<br>DAVID CHAVEZ-CHAVEZ (2),<br>JOEL CHAVEZ-CHAVEZ (3),<br>PATRICIA MENDEZ-LOPEZ (4),<br>OMAR ESTRADA-ESQUIVEL (5),<br>MIGUEL SANDOVAL-VALENCIA (6),<br>LUIS SANDOVAL-VALENCIA (7),<br>CARLOS PEREZ (8),<br>RICARDO MADRIGAL (9),<br>ISMAEL PENA (10),<br>TERESA HERMOSILLO (11),<br>RUBY ARELLANO (12),<br>ROSA ARELLANO (13),<br>RUBEN HERNANDEZ-ROMERO (14),<br>SALVADOR OJEDA-AMARILLAS (15),<br>GERARDO CASANOVA (16),<br>JOAQUIN BUCIO-RODRIGUEZ (17),<br>SALVADOR CHAVEZ-CHAVEZ (18),<br>JULIO LUA-CHAVEZ (19),<br><br>　　　　　　　　　　Defendants. | CASE NO. 07CR1408 WQH<br><br>ORDER |

HAYES, Judge:

　　The matter before the Court is the Motion for Discovery of Application, Affidavits and Orders concerning Wire Intercepts and Pen Registers (Doc. # 237) filed by Defendant Joaquin Bucio-Rodriguez and joined in by Defendant Andres Chavez-Chavez (Doc. # 267); Defendant Salvador Chavez-Chavez (Doc. # 238); Defendant Carlos Perez (Doc. # 239); Defendant Gerardo Casanova (Doc. # 240); Defendant Luis Sandoval-Valencia (Doc. # 242); Defendant Patricia Mendez-Lopez (Doc. # 247); Defendant Teresa Hermosillo (Doc. # 253); Defendant

Salvador Ojeda-Amarillas (Doc. # 254); Defendant Julio Lua-Chavez (Doc. # 255); and Defendant Miguel Sandoval-Valencia (Doc. # 256). Defendants move the Court for an order requiring the Government to provide the following discovery: 1) the applications and orders for pen registers relied upon in the wiretap applications in this case; 2) orders, affidavits, and applications for nine[1] court-ordered wiretaps in the case of *United States v. Arreola,* 06cr590-H; and 3) copies of transcripts of all *ex parte* hearings of wire intercepts and/or pen register applications in the *Arreola* case.

## BACKGROUND FACTS

On May 7, 2007, the grand jury returned the indictment in this case charging Defendant Andres Chavez and eighteen other defendants with conspiracy to import methamphetamine, conspiracy to distribute methamphetamine, possession of methamphetamine with intent to distribute, money laundering conspiracy, and money laundering. This indictment resulted from the investigation of the alleged drug trafficking activities of Andres Chavez which included approximately ten months of court-authorized wiretaps beginning on or about July 26, 2006. The Government has provided the Defendants with all materials related to these court-authorized wiretaps.

The first wiretap application in this case sought interception of the wire communications of Andres Chavez, David Chavez, Gerardo Casanova, Carlos Aviles and others from a wireless cell phone number (T-2) used by Andres Chavez. In the affidavit in support of the first wiretap application dated July 26, 2006, the agent informed the judge that Andres Chavez is a multi-pound methamphetamine distributor in San Diego County, that Aviles heads a transportation cell that imports methamphetamine, and that the two individuals appear to be a common drug-trafficking group. (Doc # 287-2 at 3.) The agent stated:

> In 2005 and 2006, DEA agents and other law enforcement officers investigated a San Diego County-based methamphetamine trafficker, Jorge Arreola-Gomez. As part of that investigation, several defendants including Arreola (who is in custody) were charged with drug trafficking or money laundering offenses, and agents seized over 140 pounds of methamphetamine, about 20 pounds of pseudoephedrine (a nasal decongestant commonly used to manufacture,

---

[1] Defendants have identified six federal wire intercepts; three Los Angeles County Superior Court wire intercepts; and two Reno, Nevada wire intercepts.

methamphetamine), weapons, over $200,000 in drug proceeds, and several vehicles. That investigation relied in part on court-authorized wire intercepts from September 2005 to March 2006 of phones used by Arreola and others. Among the individuals intercepted in drug related conversations with Arreola was a male then known only as "Pacas" (later identified as Andres Chavez-Chavez). Pacas used two phones to speak to Arreola, including (619) 818-3212 (T-1).

(Doc. # 287-2 at 4.) The agent stated in the affidavit that "[i]n April or early May 2006, an informant (CS-1) advised that 'Pacas' was a multi-pound methamphetamine trafficker in San Diego County. CS-1 said Pacas and Jorge Arreola-Gomez were partners in distributing methamphetamine until two to three years ago when they separated and each took their own customer base. CS-1 said Pacas had been looking into obtaining Arreola's customer base after Arreola's March 2006 arrest." *Id*. CS-1 provided a phone number for Andres Chavez which was the same number (T-1) intercepted in the *Arreola* wiretaps.

The agent stated that on May 9, 2006, CS-1 recorded a phone call to Andres Chavez at T-1 to obtain methamphetamine; that on May 11, 2006, SC-1 introduced an undercover agent to David Chavez who was sent by his older brother Andres Chavez; and that David Chavez provided the undercover agent with a methamphetamine sample. During the meeting, the undercover agent spoke to Andres Chavez by phone to discuss future meetings and David Chavez provided the undercover agent with a phone number (T-1) for Andres Chavez. (Doc. # 287-2 at 5.)

The agent stated in the affidavit that on May 15, 2006, CS-1 received a phone call from Andres Chavez in which Andres Chavez told the informant that one of his workers had been arrested; that law enforcement took the workers phone which had his number in it; and that he had obtained a new phone number (T-2). Andres Chavez told CS-1 to give his new number to the undercover agent. The agent further stated that on May 24, 2006, the undercover agent called the new number (T-2) to set up a purchase of one pound of methamphetamine from Andres Chavez, through his brother David Chavez. (Doc. # 287-2 at 6.)

The agent detailed other information in the affidavit gathered through phone calls recorded by the undercover agent, surveillance, and phone analysis relating to Andres Chavez and Carlos Aviles. The agent stated in the affidavit that "Salvador Chavez (at the time his

1 identity was unknown) was intercepted during the Jorge Arreola investigation seeking
2 methamphetamine. For example, on February 4, 2006, Salvador Chavez asked Arreola, in
3 substance, to sell him methamphetamine and to lower the price from $9,500 per pound. On
4 February 5, 2006, Salvador Chavez told Arreola he was ready, and he needed a 'handful'
5 [probably five pounds] of methamphetamine." (Doc.# 287-2 at 11.)

6     In the Section II: Necessity of the affidavit, the agent stated :

> . . . Andres Chavez and, to a lesser extent, his brother Salvador were intercepted during the Jorge Arreola investigation (at the time, they were not identified). Those calls confirmed the Chavez brothers are methamphetamine traffickers, but did not provide information sufficient to accomplish the objectives in paragraph 6. I believe the reason is the brothers' phones were not targeted and therefore we only intercepted them sporadically and by chance. Because we were intercepting the brothers through Arreola's phones, those calls also naturally focused largely, if not entirely, on their interactions with Arreola. In other words, there was no reason, in those calls, with Arreola, for Andres Chavez to discuss matters in paragraph 6. By contrast, I believe a wiretap on Andres Chavez's phone should produce at least more of the information we seek, because in the course of conducting his drug business, he necessarily will need to coordinate with buyers, those who assist him, and those above him in the distribution chain - i.e., those persons he had no reason to talk about in his conversations with Arreola.

15 (Doc. # 287 at 26.) Attached to the affidavit of the agent was a page titled "<u>PRIOR
16 APPLICATIONS</u>" which listed six authorized interceptions of wire communications from
17 October 3, 2005 through February 21, 2006 and stated as to each order that "Andres Chavez-
18 Chavez, aka Pacas, was intercepted under that order." (Doc # 287-2 at 29.) The list further
19 stated that Salvador Chavez-Chavez was intercepted under two of the six orders.

20 **APPLICABLE LAW**

21     Under Rule 16(a)(1)(C), "the government shall permit the defendant to inspect and copy
22 or photograph books, papers, documents, photographs, tangible objects, . . . or copies or
23 portions thereof, which are within the possession, custody or control of the government, and
24 which are material to the preparation of the defendant's defense or are intended for use by the
25 government as evidence in chief at the trial, or were obtained from or belong to the defendant."
26 Fed. R. Crim. P. 16(a)(1)(C). Defendants are entitled to discover only those materials that are
27 relevant to Defendants' response to the Government's case-in-chief. *United States v. Chon,*
28 210 F.3d 990, 995 (9th Cir. 2000). "To obtain discovery under Rule 16, a defendant must

1 make a prima facie showing of materiality." *United States v. Zone*, 403 F.3d 1101, 1107 (9th
2 Cir. 2005).

## ANALYSIS

1. *Pen Registers*

Defendants contend that they are entitled to the pen register applications, affidavits and orders in this case in order to meaningfully challenge the constitutionality of the wire intercepts. Defendants assert that the affidavits in support of the wiretaps in this case relied upon the telephone toll analysis derived presumably from pen registers. Defendants assert that "[i]f the pen registers were not lawfully in place, then the wiretap that was partially based upon the evidence obtained from the pen register cannot stand." (Doc # 237-2 at 7.) Defendants contend that the applications and the orders in support of the pen registers must be produced in order for them to determine whether the government complied with the pen register statute, 18 U.S.C. § 3122 and 3123. Defendants further assert that there can be no meaningful attack on the matter of necessity for the wire intercept orders without production of the applications and orders for the pen registers.

The Government asserts that Defendants have not identified any legal basis for claiming a right to discovery of the applications and orders relating to the pen registers. The Government asserts that the lawfulness of the pen registers has no impact upon the admission of the wiretap evidence in this case and that a challenge to the validity of the pen register applications would have no bearing on the issue of necessity for the wiretaps.

The wiretap applications in this case included a necessity section in which the Government set forth its reasons why the information from the pen registers was not sufficient to achieve the goals of the investigation. Defendants have not set forth any factual or legal link between the legality of the pen registers and the required showing of necessity for the wiretaps.

The United States Supreme Court held in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577 (1979) that the use of a pen register does not constitute a search for Fourth Amendment purposes. The Supreme Court concluded that people do not have a subjective expectation of privacy in numbers they dial because they "realize that they must convey phone numbers to

1  the telephone company, since it is through telephone company switching equipment that their
2  calls are completed." *Id*. at 743-44.  More recently, the Court of Appeals concluded in *United*
3  *States v. Forrester*, 512 F.3d 500 (9th Cir. 2008) that even evidence obtained in violation of
4  the pen register statute need not be suppressed because "there is no mention of suppression of
5  evidence in the statutory text." *Id*. at 512.

6        The Court concludes that Defendants have made no showing of materiality to support
7  the requested pen register discovery in this case.  Defendants have not stated any grounds
8  which would tend to show that the pen register applications and orders would be helpful to the
9  preparation of the defense.  There is no link between the reference to the pen register
10 applications in the necessity section of the wiretap affidavit in support of the wiretap and any
11 possible challenge to the validity of the wiretaps, and Defendant has not identified a legal basis
12 for asserting that a violation of the pen register statute could lead to the exclusion of the
13 wiretap evidence in this case.

14 2.  *Wiretap affidavits, orders and transcripts from other investigations*

15       Defendants seek an order of the Court requiring the Government to produce nine
16 wiretap orders, affidavits, and applications which support the September 2005 to March 2006
17 court-authorized wire intercepts in the case of *United States v. Arreola,* 06cr590-H.
18 Defendants contend that the Government has an obligation to provide the documents in support
19 of the *Arreola* wiretaps because the affidavit in support of the July 26, 2006 wiretap
20 application in this case identified six wiretap applications from the *Arreola* investigation as
21 "PRIOR APPLICATIONS."  Defendants contend that the entire case against them rests on the
22 constitutionality of the *Arreola* wire intercept orders because some Defendants in this case
23 were intercepted during the execution of the *Arreola* wiretaps and the intercepts from the
24 *Arreola* investigation lead to the investigation and the wire intercepts in this case.

25       Defendants assert that "if there is a constitutional deficiency in the *Arreola* order(s) and
26 if the confidential source [used in the initial wiretap order in this case] was obtained as a result
27 of calls intercepted as a result of the *Arreola* order(s), then the Chavez-Chavez orders are
28 'derived from' and 'fruit of the poisonous tree' because discovery of the confidential source

1 was not independent of the unlawful Arreola intercept order." (Doc. # 273 at 3). Defendants
2 assert that the Government cannot insulate the wiretap orders in this case from the validity of
3 the wiretap orders in *Arreola* without a showing that CS-1 is completely independent of the
4 *Arreola* investigation. Defendants contend that they are entitled to discovery of the *Arreola*
5 applications and affidavits in order to assess the nexus between the original illegality (assumed
6 in the *Arreola* wiretaps) and the specific evidence subject to challenge (the wiretaps in this
7 case).

8       The Government contends that the only Defendants in this case who could have
9 standing to challenge the *Arreola* wiretap orders are Andres Chavez and Salvador Chavez
10 because they are the only Defendants identified as intercepted in the *Arreola* wiretaps. The
11 Government further asserts that the Defendants cannot establish that the *Arreola* wiretap
12 pleadings are material in any way to the defense in this case. The Government asserts that there
13 is no authority to support the sweeping use of the exclusionary rule advanced by the
14 Defendants. The Government contends that there was no nexus between the *Arreola* wiretaps
15 and evidence in support of the probable cause determination in the first wiretap application in
16 this case. The Government asserts that the attenuated exception to the exclusionary rule would
17 prevent the Defendants from attacking the probable cause for the wiretaps in this case using
18 the *Arreola* wiretaps.

19       The Government contends that the exclusionary rule does not extend to the identity of
20 targets which arise from illegal wiretaps. The Government asserts that the probable cause for
21 the first wiretap in this case revolved around a single drug deal which occurred approximately
22 two months after the *Arreola* wiretap had ended and that the calls made to the target phone
23 regarding the drug deal were made by the undercover agent not the confidential source. The
24 Government contends that probable cause for July 26, 2006 wiretap order was established
25 through a single, stand alone undercover operation which would have no taint from any
26 illegality in the *Arreola* wiretaps.

27 <u>Materiality</u>

28       Defendants must show materiality in order to be entitled to the discovery requested.

1    There is no basis for this Court to order discovery of any *Arreola* wiretap materials in this case,
2    without some legal or factual basis to relate the *Arreola* wiretaps to the evidence in this case.
3    Defendants prima facie showing of materiality rest upon a successful challenge to the legality
4    of the *Arreola* wiretaps and the legal theory that the exclusionary rule can be used to suppress
5    the wiretaps in this case.

6    <u>Standing</u>

7         For the purposes of challenging wiretaps, 18 U.S.C. § 2518(10)(a) provides that: "[a]ny
8    aggrieved person in any trial, hearing or proceeding in or before any court . . . may move to
9    suppress the contents of any wire or oral communication intercepted pursuant to this chapter,
10   or evidence derived therefrom, on the grounds that . . . the communication was unlawfully
11   intercepted. . . [or] the order of authorization or approval under which it was intercepted is
12   insufficient on its face."  An aggrieved person is defined as one "who was a party to any
13   intercepted wire, oral, or electronic communication or a person against whom the interception
14   was directed."  18 U.S.C. § 2510(11).   The Supreme Court has interpreted these provisions
15   as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were
16   violated by interception. *Alderman v. United States*, 394 U.S. 165, 176 n. 9, 89 S.Ct. 961
17   (1969).

18        An individual's "capacity to claim the protection of the Fourth Amendment depends
19   . . . upon whether the person who claims the protection of the Amendment has a legitimate
20   expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct.
21   469 (1988) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421 (1978).  An individual
22   must have a sufficient connection to the place invaded to assert the protection of the Fourth
23   Amendment. *United States v. Crawford*, 323 F.3d 700, 706 (9th Cir. 2003).  *see also Carter*,
24   525 U.S. at 99 (Kennedy, J. concurring) ("Fourth Amendment rights are personal, and when
25   a person objects to the search of a place and invokes the exclusionary rule, he or she must have
26   the requisite connection to that place.").

27        The touchstone for the Fourth Amendment standing analysis is whether the individual
28   asserting his or her right to challenge the interception had a reasonable expectation of privacy

1 in the place where the wiretap was used. *United States v. Gonzalez,* 412 F.3d 1102, 1116 (9th
2 Cir. 2005).  The Court of Appeals has concluded that "a defendant may move to suppress the
3 fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in
4 an intercepted conversation, or if such conversation occurred on his premises." *United States*
5 *v. King*, 478 F.2d 494, 506 (9th Cir. 1973) (citing *Alderman v. United States*, 394 U.S. at 176,
6 89 S.Ct. 961).

7       "[S]tanding to invoke the exclusionary rule has been limited to situations where the
8 Government seeks to use such evidence against the victim of the unlawful search." *Illinois v.*
9 *Gates*, 462 U.S. 213, 255, 103 S.Ct. 2317 (1983); See *United States v. Leon,* 468 U.S. 897,
10 910, 104 S.Ct. 3405 (1984); *Rakas v. Illinois,* 4399 U.S. 128, 99 S.Ct. 421 (1978); *Brown v.*
11 *United States*, 411 U.S. 223, 93 S.Ct. 1565 (1973); *Alderman v. United States*, 394 U.S. 165,
12 176, 89 S.Ct. (1969);  *Wong Sun v. United States*, 371 U.S. 471, 491-491, 83 S.Ct. 401, 419-
13 420 (1963).  In this case, the July 26, 2006 wiretap application identified Defendants Andres
14 Chavez and Salvador Chavez as intercepted in six *Arreola* wiretaps.  The Court concludes that
15 Defendants Andres Chavez and Salvador Chavez could have standing to move to suppress the
16 fruits of these six identified federal wiretaps.  The remaining Defendants "cannot assert
17 indirectly what [they] cannot assert directly." *United States v. Scasino*, 513 F.2d 47, 51 (5th
18 Cir. 1975).  The Court concludes that no Defendant in this case other than Andres Chavez and
19 Salvador Chavez has standing to challenge an illegality in the *Arreola* wiretaps or to invoke
20 the exclusionary rule to challenge the wiretaps in this case through the *Arreola* wiretaps.

21 <u>Exclusionary Rule</u>

22       18 U.S.C. § 2515 requires the suppression of not only the illegally intercepted wire
23 communication itself but also any "evidence derived therefrom."  The courts have "long
24 recognized that § 2515 codifies the 'fruits of the poisonous tree' doctrine with respect to
25 violations that trigger application of the section." *United States v. Smith*, 155 F.3d 1051, 1059
26 (9th Cir. 1998).  In *Wong Sun v. United States*, 371 U.S. 471 (1963), the United States
27 Supreme Court articulated the basic standard for analyzing "fruit of the poisonous tree" issues:
28 "The . . . question in such a case is 'whether, granting establishment of the primary illegality,

1  the evidence to which instant objection is made has been come at by exploitation of that
2  illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
3  *Id.* at 488 (quoting John McArthur Maguire, *Evidence of Guilt* 221 (1959)).  The Court has
4  fashioned three distinct exceptions to the "fruits" exclusionary rule: (1) the "independent
5  source" exception; (2) the "inevitable discovery" exception; and (3) the "attenuated basis"
6  exception. *Smith*, 155 F.3d at 1060.  In *Smith*, the Court of Appeals explained that

> [t]he "attenuated basis" exception is, at bottom, the manifestation of the courts' consistent rejection of a 'but for' causation in 'fruit of the poisonous tree' doctrine. As the Supreme Court put the matter in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978):
>> Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a "per se or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.
>
> Rather, the taint inquiry is more akin to a proximate causation analysis. That is, at *some* point, even in the event of a direct and unbroken causal chain, the relationship between the unlawful search or seizure and the challenged evidence becomes sufficiently weak to dissipate any taint resulting from the original illegality. In other words, at *some* point along the line, evidence might be "fruit," yet nonetheless be admissible because it is no longer "tainted" or "poisonous." Of course, the line between "taint" and "attenuation" is not an easy one to draw. As a leading treatise observes, "there is not now and doubtless will never be any litmus paper test for determining when there is only an 'attenuated connection' between a Fourth Amendment violation and certain derivative evidence." Rather, the "question of attenuation inevitably is largely a matter of degree. Whether derivative evidence is admitted or excluded "will depend upon the precise role the illegal seizure in fact played in the subsequent discovery."
> ...
>
> The baseline inquiry in evaluating taint is not whether an unlawful search was the 'impetus' for the investigation or whether there is an unbroken 'causal chain' between the search and the incriminating evidence; rather, courts must determine whether "anything seized illegally, or any leads gained from illegal activity, tend[ed] *significantly to direct* the investigation toward the specific evidence sought to be suppressed." And although it is by no means clear precisely what constitutes "significant direction" sufficient to trigger the exclusion remedy, courts have deemed it probative whether the initial illegality "led *directly* to any of the evidence actually used against the defendant at trial." Or, to put the matter slightly differently, whether the government's evidence was the "direct result" of an unlawful search and seizure. On the other hand, it is *not* sufficient in demonstrating taint that an unlawful wiretap "may have been a factor in the decision to 'target' a specific defendant, or that an illegal search uncovers the alleged perpetrator's identity, and therefore "directs attention to a particular suspect." The nexus between the original illegality and specific evidence subject to challenge must be a close one.

155 F.3d at 1061. (Citations omitted).

   18 U.S.C. Section 2518(1)(e) provides that each application for an order authorizing or

1  approving the interception of a wire communication shall include "a full and complete
2  statement of the facts concerning all previous application known to the individual authorizing
3  and making the application, made to any judge for authorization to intercept, or for approval
4  of interceptions of wire, oral, or electronic communications involving any of the same persons,
5  facilities or places specified in the application, and the action taken by the judge on each such
6  application."  The Court concludes that the identification of the six wiretap applications from
7  the *Arreola* investigation as "PRIOR APPLICATIONS" in the July 26, 2006 affidavit would
8  not, in and of itself, support the application of the exclusionary rule to the wiretaps in this case
9  even if there was an illegality in one of the *Arreola* applications.  The Court concludes that the
10 reference to another application in which the Defendants were intercepted alone does not
11 provide the direct nexus required to support the application of the "fruit of the poisonous tree"
12 doctrine.

13        Under Ninth Circuit precedent, the inquiry in evaluating taint is "whether anything
14 seized illegally or any leads gained from illegal activity, tend significantly to direct the
15 investigation toward the specific evidence sought to be suppressed." *United States v. Cales,*
16 493 F.2d 1215, 1216 (9th Cir. 1974).  The nexus between the original illegality and the specific
17 evidence subject to challenge must be a close one.  *Smith*, 155 F. 3d at 1061. Even assuming
18 that the *Arreola* wiretap is unlawful, the wiretaps evidence in this case would not be
19 suppressed under the "fruit of the poisonous tree" doctrine if the connection between the
20 *Arreola* wiretaps and the probable cause basis for the wiretaps in this case is "so attenuated as
21 to dissipate the taint."  *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529
22 (1988)(quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939).  It is not sufficient to
23 demonstrate taint that an unlawful wiretap "may have been a factor in the decision to 'target'"
24 a specific defendant.  *Cales,* 493 F.2d at 1216 or that an illegal search uncovers the alleged
25 perpetrator's identity and therefore "directs attention to a particular suspect." *Hoonsilapa v.*
26 *INS*, 575 F.2d 735, 738 (9th Cir. 1978).

27        If the Defendants show an illegality in the *Arreola* wiretap orders, this Court would be
28 required to examine the "precise role" that the *Arreola* wiretap played in obtaining the wiretaps

1 in this case in order to determine whether the exclusionary rule would preclude the use of the
2 wiretap evidence from this case as "derived from" the illegality in the *Arreola* case. *United*
3 *States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir. 1971). Based upon the current record, the
4 Court cannot determine the precise role that information obtained from the *Arreola* wiretaps
5 played in obtaining the initial July 26, 2006 wiretap, i.e. whether CS-1 was identified
6 independent of the *Arreola* wiretaps. The Court will order a further hearing for Defendants
7 Andres Chavez and Salvador Chavez to address the pending discovery motion as to the six
8 prior applications identified in the July 26, 2006 application.

## CONCLUSION

It is hereby ordered that the Motion for Discovery of Application, Affidavits and Orders concerning Wire Intercepts and Pen Registers (Doc. # 237) filed by Defendant Joaquin Bucio-Rodriguez and joined in by Defendant Carlos Perez (Doc. # 239); Defendant Gerardo Casanova (Doc. # 240); Defendant Luis Sandoval-Valencia (Doc. # 242); Defendant Patricia Mendez-Lopez (Doc. # 247); Defendant Teresa Hermosillo (Doc. # 253); Defendant Salvador Ojeda-Amarillas (Doc. # 254); Defendant Julio Lua-Chavez (Doc. # 255); and Defendant Miguel Sandoval-Valencia (Doc. # 256) are denied.

It is further ordered that the discovery joinder motions filed by Defendant Andres Chavez-Chavez (Doc. # 267) and Defendant Salvador Chavez-Chavez (Doc. # 238) will remain pending only as to the six prior applications identified in the July 26, 2006 application and are otherwise denied. The Court will hold a further hearing regarding this requested discovery on April 30, 2008 at 9:30 a.m.

DATED: April 22, 2008

**WILLIAM Q. HAYES**
United States District Judge